# SPITZER *v.* FRIEDLANDER.

MALICIOUS PROSECUTION; PROBABLE CAUSE; MALICE.

1. The burden is on the plaintiff in an action for malicious prosecution to show want of probable cause and malice on the defendant's part, and both must concur.

2. Malice, in such a case, may be inferred from a total want of probable cause, but want of probable cause can not be inferred from established malice.

3. Probable cause for a criminal prosecution lies in the existence of such facts and circumstances as would reasonably excite the belief in the mind of an ordinarily cautious man, acting on the facts and circumstances within the knowledge of the prosecutor at the time, that the accused was guilty of the crime charged; and if there be probable cause, the motives of the prosecutor are immaterial.

4. Where in an action for malicious prosecution the facts tending to show want of probable cause are in dispute, their existence is for the jury, and their effect when found is for the court; but

where the facts are not in dispute, the existence or want of probable cause is for the court.

5. In an action by a clerk against his former employer for malicious prosecution of a charge of embezzlement, in which the plaintiff was acquitted, where the testimony showed that upon the discovery by the defendant of extravagance and irregularity in the life of the plaintiff and the omission of items of daily sales, the former lost the confidence he formerly had in the latter's integrity and suspected him of embezzlement and caused him to be criminally prosecuted, *held*, upon a review of all the testimony and in affirmance of a judgment of the lower court upon a verdict for the defendant directed by that court, that there was probable cause for the prosecution of the plaintiff.

6. The facts and circumstances prompting the action of the defendant in such a case are to be considered as of the time when the criminal charge was brought.

7. The character and extent of the inquiry that must be made by one who causes another to be criminally prosecuted and whether a personal explanation must be first demanded of the person suspected must depend upon the circumstances of each case.

No. 857.   Submitted March 21, 1899.   Decided May 2, 1899.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia on a verdict directed by the court in an action for malicious prosecution. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an action for malicious prosecution, and the appellant, Israel Spitzer, who was plaintiff in the court below, has appealed from a judgment entered upon a verdict for the defendant, Samuel Friedlander, that was returned pursuant to the direction of the court.

It appears from the evidence, that the defendant, Samuel Friedlander, had been engaged in the sale of clothing and "furnishings," in a shop on Seventh street, in the city of Washington, for some years prior to January 18, 1896. Plaintiff, Israel Spitzer, had been in defendant's service for more than a year, as cashier. He was not quite twenty-one years of age on January 18, 1896, was unmarried and lived with his parents. There were three regular salesmen

in the house. Defendant was generally about the house during business hours. He frequently sold goods, and occasionally plaintiff assisted, but his regular duties were those of a cashier. Sales, with few exceptions, were made for cash. Each of the regular salesmen was provided with a sales book with pages numbered from one to one hundred, inclusive. Each page contained two printed forms that were alike, showing blanks for entry of dates and names of salesmen, and a descriptive list of the articles on sale. It was the duty of the salesman, on completing a sale, to enter on both blanks his name, the article sold, the cost mark and the price obtained. One of these, called the slip, was then torn from the page and delivered at the cashier's desk with the money; the other, called the stub, remained in the book and was kept by the salesman until the last page was used. Cash paid out for expenses was noted by the cashier. It was the latter's duty and custom, at the close of each day, to make up a daily sheet. This sheet showed the item, cost mark and price of sale as returned by each salesman, in a separate column, with another column showing the cash paid out in expenses. Defendant generally looked over the sheet with plaintiff. They did not compare the slips with the stubs, and sometimes when there was more cash than the slips called for, defendant would explain it by a sale made by himself, and a balance would be made in that way. Plaintiff enjoyed the complete confidence of the defendant until January 15, 1896, and there had never been any disturbance of their friendly relations. On the night of January 18, 1896, the defendant made a complaint in the police court against the plaintiff, charging him with the embezzlement of thirteen dollars on the 6th day of the same month, and caused his immediate arrest upon a warrant from that court.

On January 21, 1896, a similar complaint was made charging plaintiff with the embezzlement of $240.65 on or about January 18.

On January 29, 1896, plaintiff was held to bail by the police court in the sum of $1,000 to await the action of the grand jury on the first complaint, and his personal recognizance in the same sum was taken on the second.   On March 26, 1896, the grand jury presented an indictment against plaintiff, charging him with embezzlement.   This indictment contained six counts charging specific acts on November 30, December 5, and December 17, 1895, and on January 6, and January 15, 1896.   The presentment was made on the evidence of defendant, Samuel Friedlander, and Herman Wolf.

Plaintiff was tried and acquitted April 28, 1896.   Prior to the prosecution he possessed a good reputation for integrity and business capacity.   This suit was begun May 25, 1896, and the judgment appealed from was rendered April 22, 1898.

*Mr. Chas. Maurice Smith* and *Mr. Edwin Forrest* for the appellant:

1. The question of whether or not there was probable cause for the prosecution in this case should have been submitted to the jury.   What is probable cause?   Certainly not mere rumor or suspicion.   It is, however, the fair and honest belief of a reasonable mind, acting upon such information and facts within his knowledge, at the time of the making of the charge, as would induce him to honestly believe that the person charged was guilty of the offense.   Townshend on Slander and Libel, Sec. 428.

2. In the case at bar the defendant, admitting for the sake of argument that there might have been a suspicion directed against the plaintiff, made no demand of him for an explanation in order to test a foundation for such a suspicion or to see if the plaintiff could not readily explain the same. *Johns* v. *Marsh*, 52 Md. 336; *Perryman* v. *Lister*, L. R., 3 Exch. 197; Addison on Torts, 592; 4 L. R., H. L. 521; *Grates* v. *Williams*, 55 Ind. 461; *Paddock* v. *Watts*, 116 Ind. 149; Cooley on Torts, 182.   Especially should the defendant have

been required to ask for such an explanation in view of the good character of the plaintiff as shown in the evidence. Among the circumstances tending to prove want of probable cause for the prosecution complained of, the good character of the accused stands out prominently, and is a strong fact, if known to the accuser, to ward off suspicion, to weaken a belief, he being a cautious and prudent man, in the guilt of the suspected party. *Ross* v. *Innis*, 35 Ill. 487. See, also, Greenleaf, Sec. 458.

3. The defendant should have honestly believed that the plaintiff was guilty of the offense charged. *Spear* v. *Hiles*, 67 Wis. 350; *Shaul* v. *Brown*, 28 Iowa, 37; *Jacks* v. *Stimson*, 13 Ill. 701; *Wills* v. *Noyes*, 12 Pick. (Mass.) 324; *Hall* v. *Hawkins*, 5 Humph. (Tenn.) 357; *Farnam* v. *Feely*, 56 N. Y. 451; *Woodworth* v. *Mills*, 61 Wis. 44; *Fagan* v. *Knox*, 1 Abb. (N. Y.) 246; *Krulevitz* v. *Railroad Co.*, 140 Mass. 573.

4. Of course, it is a cardinal principle that, in actions of this sort, want of probable cause and malice should both exist. As to the latter, it may be either malice in law or malice in fact. In all cases, however, "the existence of malice is always a question exclusively for the jury. The court has no right to find it, nor to instruct the jury that they may return a verdict for the plaintiff without it." *Stewart* v. *Sonneborn*, 98 U. S. 187; *Wheeler* v. *Nesbitt*, 24 How. 544. Malice may be inferred—that is, considered proven—from the activity and zeal of the defendant in conducting the prosecution against the plaintiff. *Straus* v. *Young*, 36 Md. 246; *Tickinger* v. *Wagner*, 46 Md. 581; *Dietz* v. *Langflit*, 63 Pa. St. 234; *Blass* v. *Gregor*, 15 La. 421; *McKown* v. *Hunter*, 30 N. Y. 625; *Mowby* v. *Whipple*, 8 R. I. 360; *Forbes* v. *Hayman*, 75 Va. 168; *Page* v. *Cushing*, 38 Maine, 523; *Humphries* v. *Parker*, 52 Maine, 502; *Mitchell* v. *Wall*, 111 Mass. 492; *Pullin* v. *Glidden*, 66 Me. 202, *Wiggin* v. *Coffin*, 3 Story (U. S.), 1.

*Mr. Tracy L. Jeffords* for the appellee :

1. The only question raised before this court is this: Did the trial judge err in directing the jury to render a verdict for the defendant? Such an action should be carefully guarded and its principles strictly adhered to. Newell on Malicious Prosecution, 21, 22; *Stone* v. *Crocker*, 24 Pick. 83. What facts and circumstances amount to probable cause is a pure question of law. Where the facts are undisputed, or where all the facts which the plaintiff's evidence conduces to prove do not show want of probable cause, it becomes a mere question of law which the court must decide, and it would be useless and improper to take the opinion of a jury upon it. Newell, 278; 14 Encyc. Law, 48; *Kidder* v. *Parkhurst*, 3 Allen, 393; *Ramsey* v. *Arrott*, 64 Texas, 320; *Johns* v. *Marsh*, 52 Md. 323; *Grant* v. *Moore*, 29 Cal. 644; *Driggs* v. *Burton*, 44 Vt. 124; *Besson* v. *Southard*, 10 N. Y. 236; *Anderson* v. *How*, 116 N. Y. 336; *Stewart* v. *Sonneborn*, 98 U. S. 187; *Crescent City Co.* v. *Butchers' Union*, 120 U. S. 149.

2. Commitment by an examining magistrate of a person charged with an offense, and indictment by grand jury, have almost universally been held to be *prima facie* evidence of probable cause, and sometimes to be conclusive of existence of probable cause, and the acquittal of person accused is not evidence of want of probable cause. Newell, 289, 290; *Railway Co.* v. *Brewer*, 78 Md. 405; *Garrard* v. *Willet*, 4 J. J. Marshall (Ky.), 628; *Boyd* v. *Cross*, 35 Md. 194; *Peck* v. *Chateau*, 91 Mo. 138; *Hall* v. *Suydam*, 6 Barb. 83; *Phillips* v. *Kalamazoo*, 53 Mich. 33; *Bacon* v. *Towne*, 4 Cush. 239.

Mr. Justice SHEPARD delivered the opinion of the Court:

Having proved the fact of his prosecution by the defendant and its termination in his acquittal, the additional burden was upon the plaintiff to show that the criminal charge was begun and carried on without probable cause, and that the defendant was actuated therein by malice. Both must concur to entitle the plaintiff to recover. *Wheeler* v. *Nesbitt*, 24 How. 544, 549.

Want of probable cause is the most important element; it may well be called the gist of the action. Malice may be inferred from the total want of probable cause; but want of probable cause, on the other hand, can not be inferred from established malice.

Probable cause for a criminal prosecution lies in the existence of such facts and circumstances as would reasonably excite the belief in the mind of an ordinarily cautious man, acting on the facts and circumstances within the knowledge of the prosecutor at the time, that the accused was guilty of the crime charged. 14 Encyc. L. 24, and cases cited; Newell, Mal. Pros. 267, 277.

And if there be this probable cause, the motives which may have actuated the prosecutor in commencing and carrying on the prosecution are not material. *Wheeler* v. *Nesbitt,* 24 How. 544, 550; *Crescent City Live Stock Co.* v. *Butchers' Union,* 120 U. S. 141, 149.

Where the facts tending to show want of probable cause are in dispute, their existence is for the determination of the jury; but their effect when found is a question for the determination of the court.

Where, as in this case, there is no dispute of fact, the existence or want of probable cause is a question of law for the exclusive determination of the court. *Stewart* v. *Sonneborn,* 98 U. S. 187, 194; *Crescent City Live Stock Co.* v. *Butchers' Union,* 120 U. S. 141, 149.

In the light of these principles it remains to consider whether the court erred in directing a verdict for the defendant on the ground that the evidence was insufficient to show the want of probable cause for his prosecution of the plaintiff. That is the single question in the case.

The evidence in respect of probable cause for the prosecution may be summed up as follows:

Defendant, pleased with the appearance and recommendations of plaintiff, employed him as cashier and declined to exact a bond. He continued to be pleased with his ser-

vices and advanced his wages from seven dollars to ten dollars per week. Defendant had perfect confidence in plaintiff and their relations were very friendly. Defendant's suspicions were aroused about January 15 by hearing that plaintiff had been visiting the race course and supporting, or aiding in the support of, a woman of bad character. He saw, in some way not known to plaintiff, a note which the latter wrote to this woman on January 4, 1896, stating an enclosure of two dollars. The porter of the store had carried frequent messages from plaintiff to this woman, and sometimes money. Defendant heard of this also.

Defendant had so much confidence in the plaintiff's integrity and efficiency that he had accepted the daily sheets without comparing the slips with the stubs in the books of the salesmen, and without noting the numbers of the slips to ascertain if any had been omitted.

The older stub books had been destroyed from time to time, with defendant's apparent knowledge.

Plaintiff testified that the purpose of using the stub books was simply to excite rivalry between the clerks and induce them to outdo one another in the amount of sales; and this seems to have been their practical use as long as the defendant's confidence in plaintiff remained unshaken. After his suspicions were aroused by the reports of plaintiff's conduct and expenses, it appears that defendant called in sales books in the hands of one or more salesmen and compared them with the corresponding daily sheets. He discovered the omission of certain slips that appeared to have been handed in to the cashier; nor could the said slips be found upon the files. The testimony of the deputy clerk of the police court, before whom the complaint, founded upon this discovery, was made, was called as a witness by plaintiff, and said that defendant there stated the suggestion of his suspicion of the misconduct of the plaintiff arising from reports of his habits before referred to, and the result of his examination of the stub books and reports. These were the

grounds that apparently influenced him in making the complaint. A police officer, also called by the plaintiff, testified to the statements made by the defendant. Defendant had some of the sales books and explained the system of keeping them and the facts discovered from their comparison with plaintiff's reports. Police Inspector Hollinberger was consulted and directed witness to investigate the matter. From this explanation witness suggested that the only thing for defendant to do was to procure a warrant.

The probable and reasonable effect of these discoveries upon the mind of the defendant can be best determined, from a point of view most favorable to the plaintiff, by the explanations which the plaintiff gave of the omitted items in testifying on his own behalf. After stating the purpose of keeping the books, before referred to, and explaining the manner of making up the day sheets, and the customary examination of them by the defendant, when the daily receipts of cash were turned over, he declared that he had made up his reports honestly and fairly and had not withheld the sums with the embezzlement of which he had been charged, or any other money belonging to the defendant at any time.

On cross-examination he identified a person who had appeared as a witness in the criminal prosecution, and said that he did not, on January 15, 1896, give plaintiff $10 on the purchase of an article for $7.50 and receive $2.50 in change, so far as plaintiff could recollect; but that if the $10 was so received it was turned in at the desk where it belonged. He further said that "the item might or might not appear on the day sheet, because it was customary at times to leave sales unentered until there was leisure for the purpose, when they would be entered up, or might possibly be forgotten, and at night if the amount was 'over,' plaintiff and defendant would think together, and probably defendant would say he had made a sale that was not down, and enter it up; that if the cash was $7.50 'over' and on refer-

ring to the slips all the sales were found entered up, the defendant or witness had made a sale which was not charged, as they never kept books; that in such case defendant would say that he remembered making a sale of so and so, and we would enter it up that way on the day sheet; that the day sheet would either show the sale or make some correction to show the amount of money, and would not show a less amount of money than was actually taken in that day." Having then been shown a sale book of Rosen, one of the clerks, he said that an entry therein of January 6, 1896, "Vest D X G," indicated that a vest of a certain cost represented by those letters had been sold by Rosen on that day for the sum shown on the stub; "that there were corresponding entries on the slip torn from the stub, but that the said entries would not be omitted either through mistake or neglect; that in such case, the cash would not necessarily show the difference; that, in that case, if they figured up and found the cash did not tally, they would find that Mr. Friedlander had not entered one of his sales." "On January 15, 1896, Rosen's book showed the sale of an overcoat for $7.50 which did not appear on the day sheet; that this might have been adjusted by Mr. Friedlander entering up the amount for sales on his own account; that if plaintiff received the money it was as likely to be entered up to Mr. Friedlander as to anyone else, and that if witness (plaintiff) received $7.50 for an overcoat which was not entered on the day sheet that would be made up of other items in Mr. Friedlander's name."

Counsel for plaintiff interposed here and said that the plaintiff did not deny he may have gotten this money, but that he did not convert it to his own use. Plaintiff then further said: "That the slips corresponding to the stubs were by him put on a steel file; that if witness was there the slips might not have come to him, but might have gone to Mr. Tabler; that three of the slips to correspond to the stub book shown witness are missing, and among

them is No. 25 for an overcoat, and upon examining the slips of that date produced by the defendant stated that the slip for the overcoat sale in question was not among them, and that the day sheet for that day showed no excess of cash over the entries; that the slips were of no importance, but lay about the desk, and the wind could have blown them away or could have destroyed them; that some were never put on file, and that it was no one's duty in particular to put them on file, witness sometimes doing this and some. times Mr. Friedlander and others."

A substantially similar explanation of the omission of the Rosen sale slip aforesaid, was made in respect of an item of $5 shown on the stub book of salesman Wolf as of November 30, 1895. Plaintiff then further explained the customary settlements made by him and defendant at the close of each day as follows:

" They would figure up the total amount of sales of each salesman for the day; they would then figure up the expense or money laid out and deduct the latter; they would then take the amount of money in the cash drawer, and, if this corresponded with the balance shown, it would be all right, and that would be copied on the day sheet; that, if any slips had not been entered on the day sheet, there would be an 'over' of cash in the cash drawer; that this cash would not be in witness' pockets instead of the cash drawer, but, if it was, the defendant could have discovered it by looking over the slips, but did not do so because he supposed he was an honest man, and that these daily settlements would not help the defendant to discover any item not entered on the day sheet unless there was a discrepancy between the footings of the day sheet and the cash in the cash drawer."

Another omission of a sale shown by Wolf's stub book for November 30, 1895, was explained as the others had been, and he added that there was an "over" of $1.00 on the day sheet for that day, and it is possible that Wolf may

have entered the same sale twice in his stub book with different cost marks.

The evidence concerning three other sales, also as of dates corresponding with those of the complaints and counts of the indictment, will best appear from the recitals of the bill of exceptions as follows:

"The witness further admitted, on cross-examination, that stub No. 33 on the Wolf sales book of November 30, 1895, contained an entry 'S. X.,' in plaintiff's handwriting, indicating the cost of the article reported sold by the said Wolf, and that no corresponding item appears on the day sheet for that day; that there were other items for the same amount with other cost marks, but none with the cost mark 'S. X.' appearing in the plaintiff's own handwriting in the stub of Mr. Wolf's book; that he finds another entry of Wolf's of one pants 2.50 on the same day, and that is marked off on the stub book; that Wolf's stubs for that day show three sales for $.50 each made by him on that day, only two of which appear on the day sheets of that day, and that the third, only indicated in Wolf's stub book by the plaintiff's own entry, did not appear on the day sheet; that there was $1 'over' on the day sheet for that day, and it is possible that Wolf may have entered the same sale twice in his stub book with different cost marks.

"The witness further, on cross-examination, identified the sales book for the same day, November 30, 1895, of salesman Rosen, and testified that stub 58 of that book reported a sale of a pair of pants at $5, which sale did not appear on the day sheets; that there were other entries of $5, but none of $5 on Rosen's list for a pair of pants, as in his said stub; that there were pants entries of that date of $5 reported as made by the defendant and by salesman Hecht, and that there was a discrepancy of $5 on that date; that he does not think he received the money; that he probably did receive the $.50 reported in Wolf's stub book, and that he probably received the $5 where his signature appears,

which has the witness' signature, but that there was $1 over on that day.

"The witness further testified, on cross-examination, that Wolf's sales book for December 5, 1895, the date of the second count of the indictment, stub 79, showed 'One suit, E. N. X., $5.90,' and that no corresponding entry appears on the day sheet for that day; that the day sheet shows an item of $4 in Wolf's column, for which Wolf turned in no slip, and that the defendant at the trial claimed witness might have entered the $4 on his stub and put the $1.90 in his pocket, but that on the same day there was $1.80 over.

"Said witness further testified, on cross-examination, that on the 17th day of December, 1895, the date of the third count in the indictment, salesman Rosen's book showed sale of a pair of pants for $4, cost mark 'S. I. N.,' and that this sale does not appear on the day sheet, nor any $4 by any other salesman, and that the cash 'over' on that date was only $.25, but that it did not necessarily follow that the defendant received the $4.

"Said witness further testified, on cross-examination, that on January 6, 1896, the date of the fourth count in the indictment, Wolf's stub No. 66 showed sale of an overcoat, cost price 'S. N. X.' for $5, and that there was no similar entry in the day sheet, but that there was one for Mr. Friedlander exactly corresponding; that on the same date in Wolf's stub book, stub No. 73, there was an entry of $8 for one suit; that the '$8' might be '1' on the stub, but that the cost mark, which was 'O. N. X.,' indicated that the suit cost $7.50, and that there was no entry of either $1 or $8 for sales made by anybody on that day corresponding with the stub, nor any cash over on that day, but if there was $8 over it was accounted for by charging up sales; that possibly they were in a hurry."

And thereupon the plaintiff was interrogated and answered as follows:

"Q. Now, Mr. Spitzer, is there any other explanation of

these things we call discrepancies, unless you failed to enter these items, and thereupon Mr. Friedlander forced a balance by saying he sold something to make it up?

"A. No, sir; I do not know that I ever received the items.

"Q. You know that you received the $.50 item?

"A. The $.50 item; yes, sir."

After a careful consideration of all the evidence disclosed by the bill of exceptions, the most important parts of which have been fully stated above, we are unable to say that the court erred in holding that there was probable cause for the prosecution of the plaintiff.

The facts and circumstances that prompted the action of the defendant are necessarily to be considered as of the time when that action was taken, and the deduction of inferences therefrom must not be influenced by the subsequent acquittal of the plaintiff, or the establishment of his innocence of the charge then made. The question is, what belief the facts then known to the prosecutor, with the surrounding circumstances, would reasonably have created in the mind of an ordinarily cautious person, in respect of the probable guilt of the accused.

It is contended on behalf of the plaintiff, that the duty of making reasonable and proper inquiry into the facts before making the complaint, was not discharged by the defendant because of his failure to demand an explanation of the plaintiff. To this we can not agree.

The character and extent of the inquiry, that in fairness ought to be made by a prosecutor, must necessarily depend upon the special circumstances of each case. Doubtless, certain cases might be presented in which by virtue of special conditions the duty would extend to inquiry, and the demand of explanation of the party suspected of the offense; but this case does not come within that class. To hold that it existed here would be to say that it must exist in all ordinary cases where a trusted employee shall be suspected of acts of embezzlement.

But had defendant demanded an explanation, what would have been the reasonable result?

Based upon information respecting the extravagance and irregular life of the plaintiff, and the discovery of the omission of entries of certain items of daily sales, he lost the confidence that he had formerly had in the plaintiff's integrity, and suspected him of embezzlement. It can not be presumed that he would have received an explanation more satisfactory than that which plaintiff himself gave when testifying in this case, and which has been stated hereinabove. That explanation, without renewal, through some other independent means, of the necessary faith in his word, would not be sufficient to remove established suspicion of his guilt.

Under age and with no apparent income save his salary of $10 per week, his recent extravagance stood in the way of a complete acceptance of his attempted explanation of the discrepancies in his cash accounts.

This he attempted to explain as a witness in this case by saying that in October he had received a gift of $250 from his father, and that his mother and brothers had given him small sums "once a week and oftener as he needed it."

He had a private bank book, but it showed no deposit of the $250. This money he said he kept in his trunk and used as he needed it. The book showed deposits at various times of "$6, $10, $4, and the like," and these he accounted for by saying, that sometimes when he did not have money in his pocket he would give a check and deposit the money to meet it on the next morning.

It was from these funds that he paid his expenses. At the same time he confessed that these gifts by mother and brothers were made not for his expenses, but because they thought that he was saving his money to go into business with. His mother and one brother were called as witnesses in the case, but no questions were asked them in regard to the said gifts of money. Had this additional explanation

been made to the defendant, or an ordinarily cautious man in his situation, it is not apparent that it would have removed the first impression of guilt.

We find no error in the action of the court, and the judgment will be affirmed, with costs. It is so ordered.

*Affirmed.*